# In the United States Court of Federal Claims

No. 20-1557

Filed: April 14, 2021

Reissued: April 29, 2021[1]

|  |  |  |
|---|---|---|
| PAE APPLIED TECHNOLOGIES, LLC, | ) ) | Redacted Version |
| Plaintiff, | ) ) ) |  |
| v. | ) ) |  |
| THE UNITED STATES, | ) ) ) |  |
| Defendant, | ) ) |  |
| and | ) ) |  |
| RELIANCE TEST & TECHNOLOGY, LLC, | ) ) ) |  |
| Defendant-Intervenor. | ) ) |  |

*Robert Stephen Nichols*, Nichols Liu, LLP, Washington, DC, for plaintiff.

*Albert Salvatore Iarossi*, U.S. Department of Justice, Civil Division, Washington, DC, for defendant.

*Douglas Leo Patin*, Bradley Arant Boult Cummings LLP, Washington, DC, for defendant-intervenor.

**OPINION AND ORDER**

**SMITH**, **Senior Judge**

This post-award bid protest is before the Court on the parties' Cross-Motions for Judgment on the Administrative Record. Plaintiff, PAE Applied Technologies, LLC ("PAE"), challenges the evaluation of offerors and the award decision issued by the Department of the Navy, Naval Air Systems Command ("Navy" or "Agency") for technical support services for missions conducted by Navy's Atlantic Test Range ("ATR") and Atlantic Targets and Marine Operations ("ATMO") Division under Request for Proposal No. N0042118R0038 ("RFP" or "Solicitation"). Administrative Record 1479 [hereinafter AR]. Specifically, plaintiff challenges

---

[1] An unredacted version of this opinion was issued under seal on April 14, 2021. The parties were given an opportunity to propose redactions and those redactions are included herein.

the Agency's award to defendant-intervenor, Reliance Test & Technology, LLC ("RTT"), based on the following: (1) the technical risks and associated cost risks with RTT's Staffing Approach; (2) the Navy's evaluation of PAE's key personnel; (3) the Navy's evaluation of PAE's past performance, and (4) the Navy's cost realism analysis. *See generally* Plaintiff's Motion for Judgment on the Administrative Record, ECF No. 54 [hereinafter Pl.'s MJAR]. In response, defendant and defendant-intervenor contend that plaintiff's proposal was unawardable due to the resignation of a required key person from PAE's subcontractor, Sabre Systems Inc. ("Sabre"). *See generally* Defendant's Response in Opposition to Plaintiff's Motion for Judgment upon the Administrative Record, and Cross-Motion for Judgment upon the Administrative Record, ECF No. 61 [hereinafter Def.'s CMJAR]; Defendant-Intervenor's Cross-Motion for Judgment on the Administrative Record and Response to Plaintiff's Motion for Judgment on the Administrative Record, ECF No. 60 [hereinafter Def.-Int.'s CMJAR]. For the reasons set forth below, the Court denies plaintiff's Motion for Judgment on the Administrative Record and grants defendant and defendant-intervenor's Cross-Motions for Judgment on the Administrative Record.

## I. Background

### A. Solicitation

Plaintiff is the incumbent contractor for the Navy's predecessor Atlantic Ranges Technical Support Services ("ARTSS") contract. *See generally* AR 6372–8027. On May 21, 2019, the Navy issued the Solicitation, which sought services such as research and development, engineering, maintenance, operation, support of facilities, systems, and equipment to support the engineering development and operational testing and fleet training missions conducted by the ATR and ATMO Division. AR 1433, 1479. The RFP provided for a best-value trade-off source selection based on the following four factors: (1) Mission Support, (2) Corporate Experience, (3) Past Performance, and (4) Cost/Price. AR 1734. The first three factors were equal in importance, each factor being more important than Cost, and the first three factors in combination were significantly more important than Cost. AR 1734.

#### 1. Mission Support Evaluation Factor

For the Mission Support Evaluation Factor, the RFP stated that the Navy would "evaluate the proposal to determine the Offeror's understanding of, approach to and ability to meet the solicitation requirements." AR 1734. As part of that evaluation, the Navy assessed each proposal "with respect to its compliance with the solicitation requirements and the risk associated with the Offerors approach." AR 1734. Consequently, the Navy assigned offerors a Mission Support Rating and a Risk Rating. AR 1735.

The Mission Support Rating assessed offerors for "compliance with the solicitation requirements and merit which considers the benefits and detriments related to program performance and operations." AR 1735. The Navy would assess the "degree of benefit" to the Navy by "determining whether the Offeror's approach and understanding of requirements rises to a level of being thorough or exceptional." AR 1735. Additionally, the Navy would assign a Risk Rating associated with the offeror's Mission Support approach. AR 1735. This assessment would "consider[] the potential for disruption of schedule, increase in costs, degradation or

performance, the need to increase Government oversight, or the likelihood of unsuccessful contract performance." AR 1735.

For Mission Support, the Navy assigned offerors ratings of "Outstanding", "Good", "Acceptable", "Marginal", or "Unacceptable." AR 1737. For Risk, the Navy assigned ratings of "Low", "Moderate", "High", or "Unacceptable". AR 1738. If offerors received a Mission Support Rating of "Unacceptable" or "Marginal", or a Risk Rating of "High" or "Unacceptable", these offerors were considered unawardable and their entire proposal may be considered unacceptable and eliminated from the competition. AR 1735.

Central to this dispute is a Mission Support requirement. Specifically, offerors were required to fulfill three key personnel positions: (1) Senior Radar Cross Section ("RCS") Engineer, (2) General Operations Manager, and (3) Aerial Targets Site Lead Operations Manager. AR 1707. Offerors were required to provide resumes demonstrating the "relevant experience of the proposed Key Personnel in tasks similar to those outlined in the [Statement of Work]." AR 1707. For contingency hires, offerors were required to submit letters of intent. AR 1707.

### 2. Cost Evaluation Factor

For the Cost Evaluation Factor, the RFP stated that the Navy would "perform a cost realism analysis to determine the most probable cost (MPC) for each applicable Offeror's proposal." AR 1736. In relevant part, the RFP detailed the Navy's process for its cost realism evaluation as follows:

> [T]he Government may review the Offeror's proposed direct labor rates and compare the proposed rates to payroll verification, Letters of Intent, historical rate ranges provided in the solicitation, or other substantiated data. Direct labor rates for SCA covered labor categories will also be reviewed to ensure they are in compliance with the applicable [Area Wage Determination] (at or above the AWD minimum rate). Pertinent cost information, including but not limited to, historical rates and DCAA approved or recommended rates for such costs as direct labor, overhead, G&A, etc., as necessary and appropriate, will be used to arrive at the Government determination of the MPC for the performance of this contract.
>
> . . .
>
> The MPC is an Offeror's total cost, including fee, and any additional adjustments to the rates that the Government has determined necessary to make the proposed cost realistic for all periods.

AR 1736.

The RFP provided the following instructions regarding direct labor for proposed current employees, contingent hires, and key personnel:

> For all proposed current employees, Offerors shall provide certified payroll verification that consists of a form containing the title, current direct labor rate, and a signed certification by an authorized representative of the company that the payroll information contained in the form is current and accurate.
>
> A "contingent hire" is an individual who has committed, under a signed letter of intent, inclusive of salary information, to being employed by the Offeror if the Offeror is awarded the contract. All proposed contingent hires shall have a letter of intent submitted under the Cost Volume outlining salary information (specified as an agreed to direct hourly rate) for the contingent hire employee. The letter of intent is a separate written agreement signed by the potential employee(s) to work for the Offeror effective at contract award.
>
> For any proposed prospective hires, Offerors shall utilize the table below that provides a rate range of direct labor rates based off of historical rates for each labor category. The only acceptable substantiation for proposing less than the Government provided labor rate range for each category is payroll verification for current employees or Letters of Intent for Contingent Hires.
>
> For proposed Key personnel, the proposed direct labor rate should be based on either certified payroll data if currently employed by the Offeror or based on the salary information (specified as an agreed to direct hourly rate) in the submitted Letter of Intent if the proposed individual is categorized as a contingent hire.

AR 1718.

For offerors proposing prospective hires, the Navy provided rate ranges of direct labor rates for all labor categories except for key personnel. AR 1718. The Solicitation stated that "[t]he Government considers these rates realistic as they are based off of historical rate information. This information is provided to all Offerors to ensure the realism of direct labor rates." AR 1718–19.

### B. Offerors and PAE's Proposal

The Navy received six proposals in response to the RFP, including a proposal from PAE. *See* AR 19897; *see also* AR 19553–54; AR 6372. The Navy determined that discussions were necessary to address proposal weaknesses, deficiencies, and solicitation compliance issues. AR 19897. A competitive range was established with all six offerors. AR 19897. On December 9, 2019, the Navy opened discussions. AR 19897. On April 24, 2020, the Navy closed discussions and requested final proposal revisions ("FPRs"). AR 18000–02. On April 28, 2020, PAE submitted its FPR. AR 18340. The remaining five offerors successfully submitted their FPRs by the April 29, 2020 deadline. *See generally* AR 18020, 18335, 18729.1, 18730, 19033.

For PAE's proposal, it provided three current employees for the key personnel positions. AR 6451–52; *see also* AR 6453–64. Pertinent to this case, PAE proposed a current employee, ▮▮▮▮▮▮▮▮, of its subcontractor, Sabre, to fill the key personnel position of Senior RCS

- 4 -

Engineer. AR 6451; *see also* AR 6453–58. Accordingly, PAE provided his resume in its proposal. AR 6454–58. PAE stated that "proposed key personnel are currently employed on the ATR/ATMO contract; therefore, we have no contingency hires." *See* AR 6452. Given that PAE did not have any contingency hires, it did not provide the requisite letters of intent.

On June 8, 2020, after FPRs were submitted, ▮▮▮▮▮ submitted his letter of resignation to Sabre indicating that his last day would be June 19, 2020. AR 21767. On June 9, 2020, a Sabre employee forwarded ▮▮▮▮▮ resignation letter to ▮▮▮▮▮, PAE's Program Manager on the incumbent contract. AR 21765. ▮▮▮▮▮ forwarded this letter to ▮▮▮▮▮, the Navy's Branch Head for Aircraft Signature and Avionics Measurement and member of the Source Selection Evaluation Board ("SSEB") for this RFP. AR 21765; AR 19894. A series of text messages between ▮▮▮▮▮ and ▮▮▮▮▮ followed.

On June 22, 2020, ▮▮▮▮▮ informed ▮▮▮▮▮ of discussions with ▮▮▮▮▮ about working directly for PAE, but ▮▮▮▮▮ said that he would "think about it over the weekend" but that he was "definitely interested." AR 21768. By July 22, 2020, ▮▮▮▮▮ informed ▮▮▮▮▮ that "[w]e have not heard back yet" but that PAE would "continue to search for a radar expert or two for you." *See* AR 21769.

On July 7, 2020, the SSEB evaluated the proposals and finalized its results in the SSEB Report. *See generally* AR 19893. A summary of the results are as follows:

| Offerors | Factor | | | | | |
|---|---|---|---|---|---|---|
| | Mission Support | | Experience | Past Performance | Price | T&C |
| | Rating | Risk | Confidence Rating | Confidence Rating | ($M) | |
| ▮ | Outstanding | Low | Satisfactory | Satisfactory | $1,069 | No Issues |
| PAE | Unacceptable | Unacceptable | Substantial | Satisfactory | $1,144 | No Issues |
| ▮ | Outstanding | Low | Satisfactory | Substantial | $1,101 | No Issues |
| RT&T | Good | Low | Substantial | Satisfactory | $978 | No Issues |
| ▮ | Good | Low | Substantial | Satisfactory | $1,132 | No Issues |
| ▮ | Outstanding | Low | Limited | Satisfactory | $1,095 | No Issues |

AR 19893. PAE was rated "Unacceptable" under the Mission Support Factor because the incumbent employee filling the Senior RCS Engineer position, ▮▮▮▮▮, "submitted a resignation letter . . . effective 19 June 2020." AR 19576. The SSEB concluded that "[s]ince the incumbent RCS Engineer will no longer be an employee of Sabre, a subcontractor to PAE, his resume is no longer valid under the PAE proposal" which represents a "material failure related to the offeror's proposal." AR 19576. As discussions and FPRs had closed, the SSEB concluded that PAE could not change its proposal. AR 19576. Accordingly, PAE was assessed with a "[d]eficiency for failing to meet a material term of the solicitation." AR 19576.

On July 31, 2020, the Source Selection Advisory Council ("SSAC") reviewed the SSEB report and provided their assessment in a Proposal Analysis Report ("PAR"). *See generally* AR 19895. The SSAC reported that PAE was the only offeror with an "Unacceptable" rating under the Mission Support Factor due to a key personnel deficiency for the Senior RCS Engineer position, a deficiency which was discovered after close of discussions. AR 19904. The evaluators noted that "without the assessed Deficiency, PAE still would have been ranked near the bottom among all offerors in the [Mission Support] Factor." AR 19904. As such, the SSAC concluded that "even if PAE were given the opportunity to correct this Deficiency, it still would not be among the most highly evaluated offerors . . . in the trade off analysis." AR 19905. Therefore, the SSAC agreed with the SSEB's assessment including the decision not to reopen discussions. AR 19905.

The Source Selection Authority ("SSA") reviewed the SSAC's assessment and, pertinent to this case, agreed with its analysis of the Mission Support Factor. The SSA specifically noted PAE's lack of an RCS Engineer and explained that it was a "significant concern." AR 19925. Specifically, the SSA noted that the difficulty in filling these key personnel positions "led to the inclusion of Key Personnel as an Element to the Mission Support Factor." AR 19925. Further, the SSA confirmed that "reopening discussions to give PAE the chance to address the deficiency would not allow PAE to improve its standing to become among the most highly rated proposals." AR 19925. As such, the SSA concluded that RTT represented the "best value to the Government, all factors considered." AR 19933. On September 1, 2020, the Navy informed PAE it had awarded the contract to RTT. AR 20898.

### C. GAO Protest and Current Procedural History

On September 14, 2020, PAE filed a protest with the Government Accountability Office ("GAO"), challenging the Agency's award decision. AR 21188–258. On November 4, 2020, the GAO denied PAE's protest, concluding that the Navy's evaluation was "reasonable and in accordance with the stated evaluation factors, and that the Navy reasonably found PAE's proposal unacceptable and ineligible for award." AR 21831. As such, the GAO concluded that PAE lacked standing to pursue its challenge against the Navy because PAE was "not an interested party for purposes of questioning the remainder of the agency's evaluation of proposals and resulting award decision." AR 21831. This protest followed.

On November 9, 2020, PAE filed its Complaint with this Court. *See generally* Complaint, ECF No. 1 [hereinafter Compl.]. On November 20, 2020, defendant-intervenor filed its Motion to Dismiss. *See generally* RTT Motion to Dismiss, ECF No. 25 [hereinafter Def.-Int.'s MTD]. On January 7, 2021, plaintiff filed its Motion for Judgment on the Administrative Record. *See generally* Pl.'s MJAR. On February 2, 2021, defendant filed its Response and Cross-Motion. *See generally* Def.'s CMJAR. Defendant-intervenor filed its Response and Cross-Motion that same day. *See generally* Def.-Int.'s CMJAR. On February 16, 2021, plaintiff filed its Reply and Response. *See generally* Plaintiff's Response and Reply in Support of its Motion for Judgment on the Administrative Record, ECF No. 62 [hereinafter Pl.'s Resp.]. On March 2, 2021, defendant and defendant-intervenor filed their respective Replies. *See generally* Defendant's Reply in Support of its Cross-Motion for Judgment Upon the Administrative Record, ECF No. 65 [hereinafter Def.'s Reply]; Defendant Intervenor RTT's Reply in Support of

its Cross-Motion for Judgment on the Administrative Record, ECF No. 64 [hereinafter Def.-Int.'s Reply]. The Court held oral argument on March 12, 2021. The parties' Motions are fully briefed and ripe for review.

## II. Standard of Review

This Court's jurisdictional grant is found primarily in the Tucker Act, which provides the Court of Federal Claims with the power "to render any judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2012). Although the Tucker Act explicitly waives the sovereign immunity of the United States against such claims, it "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976). Rather, to fall within the scope of the Tucker Act, "a plaintiff must identify a separate source of substantive law that creates the right to money damages." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part).

The Tucker Act also affords this Court with jurisdiction over bid protest actions. 28 U.S.C. § 1491(b). This Court evaluates bid protests under the Administrative Procedure Act's ("APA") standard of review for agency actions. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). Under APA standards, agency procurement actions may be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706(2)(A). In other words, a bid protest may be set aside if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332 (internal citations omitted). If a challenge is brought on the first ground, the court must determine "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (quoting *Impresa*, 238 F.3d at 1333). "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Id*.

The arbitrary and capricious standard is a highly deferential one. *Advanced Data Concepts*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). "If the [C]ourt finds a reasonable basis for [an] agency's action, the [C]ourt should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). "The Court cannot substitute its judgment for that of the agency, even if reasonable minds could reach differing conclusions." *DynCorp Int'l LLC v. United* States, 139 Fed. Cl. 481, 486 (2018) (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974)).

Under Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"), a party may file a motion for judgment upon the administrative record for the Court to assess whether an administrative body, given all disputed and undisputed facts in the record, acted in compliance

with the legal standards governing the decision under review. *See Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 382 (2013) (citing *Fort Carson Supp. Servs. v. United States*, 71 Fed. Cl. 585 (2006)). On a motion for judgment upon the administrative record, the parties are limited to the Administrative Record, and the Court makes findings of fact as if it were conducting a trial on a paper record. RCFC 52.1; *Bannum*, 404 F.3d at 1354. Looking to the Administrative Record, the Court must determine whether a party has met its burden of proof based on the evidence in the record. *Bannum*, 404 F.3d at 1355.

### III.   Discussion

#### A.   Key Personnel

In its Motion for Judgment on the Administrative Record, plaintiff argues that the Agency disqualified it from consideration "based on an unfounded conclusion" that PAE's key personnel was unavailable. Pl.'s MJAR at 11. Plaintiff further argues that the Agency's determination was arbitrary and capricious because, rather than clarifying whether plaintiff's key personnel was actually unavailable, the Agency instead relied on GAO case law that an agency can either evaluate a proposal as submitted or open discussions to allow the offeror to amend its proposal. *See generally* Pl.'s MJAR at 11–18. Finally, plaintiff alleges that the Agency could have engaged in clarifications because plaintiff did not need to change its proposal as its RCS Engineer, ███████████, was and is available to work on the current contract. Pl.'s MJAR at 13.

In response to plaintiff's allegations, defendant argues that the Navy properly concluded that PAE's Senior RCS Engineer, ███████████, was unavailable for the new contract because he resigned from his employment with PAE's subcontractor, Sabre. Def.'s CMJAR at 18–19. Defendant disagrees that the Navy relied on "unverified conjecture" regarding ███████████ availability because ███████████ stopped showing up for work on the incumbent contract, and his resignation was communicated to a member of the Navy's evaluation board. Def.'s CMJAR at 19–21. Further, defendant argues that the Agency would have to engage in discussions, not clarifications, to correct the deficiency in PAE's proposal because PAE would have to revise its proposal "to either identify a new RCS Engineer, or to add a new . . . signed letter of intent between ███████ and PAE." Def.'s CMJAR at 22. Defendant-intervenor likewise argues that plaintiff's proposal became unawardable when a key person resigned after discussions closed. *See generally* Def.-Int.'s CMJAR at 9–14.

When it comes to unavailable key personnel, this Court has already taken the position that an "agency has a choice between evaluating the original proposal as submitted, or opening discussions to allow for modified proposals." *Chenega Healthcare Servs., LLC v. United States*, 141 Fed. Cl. 254, 260 (2019) (citing *Chenega Healthcare Servs.*, LLC, B-416158, 2018 CPD ¶ 200 at 4, n.2 (Comp. Gen. June 4, 2018)). Further, this Court has noted that "any post-submission key personnel [runs] the risk of rendering the offeror's proposal unacceptable, with no opportunity to cure the defect during discussions." *Id*. (internal citation omitted). Finally, as articulated above, the reviewing court will only set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 28 U.S.C. §

1491(b)(4); 5 U.S.C. § 706(2)(A). The arbitrary and capricious standard is a highly deferential one. *Advanced Data Concepts*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).

Here, the Agency acted rationally and in accordance with the Solicitation when it rated PAE "Unacceptable" under the Mission Support Factor for a deficiency related to key personnel. The RFP required offerors to fill three key personnel positions, one of which is the Senior RCS Engineer position. AR 1707. After discussions had closed and FPRs were submitted, it became apparent that PAE was not able to meet this requirement through discussions between PAE employee, ▇▇▇▇▇▇ and a member of the Navy's evaluation board, ▇▇▇▇▇▇▇▇. On June 9, 2020, ▇▇▇▇▇▇, informed ▇▇▇▇▇▇▇, that its proposed RCS Engineer had resigned from its subcontractor, Sabre, with his last day being June 19, 2020. *See* AR 21765–67. Thus, starting from June 19, 2020, PAE no longer had an RCS Engineer.

After ▇▇▇▇▇▇▇▇ resigned, the Administrative Record shows that PAE attempted to directly hire ▇▇▇▇▇▇▇▇ to comply with the RFP's requirement to have an RCS Engineer. On June 22, 2020, ▇▇▇▇▇▇▇ informed Mr. Ashley that there were discussions with ▇▇▇▇▇▇▇▇ about working directly for PAE, but ▇▇▇▇▇▇▇▇ said that he would "think about it over the weekend" but that he was "definitely interested." AR 21768. By July 22, 2020, ▇▇▇▇▇▇▇ informed ▇▇▇▇▇▇▇ that "[w]e have not heard back yet" but that PAE would "continue to search for a radar expert or two for you." *See* AR 21769. Accordingly, the Administrative Record shows that, while PAE attempted to hire ▇▇▇▇▇▇▇▇, there was no employment agreement between the parties.

Consequently, the Court finds that the Navy properly concluded in its evaluation that PAE had a deficiency under the Mission Support Factor for failing to provide an RCS Engineer. The Agency "ha[d] a choice between evaluating the original proposal as submitted, or opening discussions to allow for modified proposals." *Chenega Healthcare*, 141 Fed. Cl. at 260 (internal citation omitted). The Navy chose to evaluate PAE's proposal as submitted. PAE's proposal at the time of FPR submission was deficient under the Mission Support Factor for failing to provide an RCS Engineer. Moreover, clarifications would not have resolved this deficiency in PAE's proposal as offerors were required to submit a letter of intent for contingent hires in accordance with the Solicitation. *See* AR 1707. PAE did not submit a letter of intent because, as stated by PAE, its "proposed key personnel are currently employed on the ATR/ATMO contract; therefore, we have no contingency hires." *See* AR 6452. Thus, the Agency acted rationally and in accordance with the Solicitation when it evaluated and rated PAE's proposal "Unacceptable" under the Mission Support Factor for a deficiency related to key personnel.

Finally, the Court finds this issue dispositive as, pursuant to the express terms of the Solicitation, offerors are considered unawardable if they receive an "Unacceptable" rating under the Mission Support Factor. However, the Court will address specific arguments related to cost realism and past performance below.

### B. Cost Realism

Plaintiff argues that the Navy failed to assess the cost risk involved with RTT's labor rates, where both PAE and RTT proposed to utilize the same incumbent workforce but RTT

"proposed to pay them far less." Pl.'s MJAR at 25. Plaintiff contends that the Navy should have adjusted RTT's proposed rates to the "same current incumbent wages that the Agency required PAE to use for its incumbent workforce." Pl.'s MJAR at 29. Ultimately, plaintiff asserts that a "proper cost realism adjustment would have increased RT[]T's [Most Probable Cost] direct labor cost by approximately $▇ million over the contract life." Pl.'s MJAR at 30.

In response, defendant argues that the Navy conducted its cost realism evaluation in accordance with the Solicitation. *See generally* Def.'s CMJAR at 37–40. Defendant notes that the Solicitation specifically considered RTT's proposed direct labor rates realistic. Def.'s CMJAR at 38–39. Defendant also notes that PAE even used the "exact same minimum rate ranges that RTT did in its proposal" for over ▇% of PAE's positions. Def.'s CMJAR at 39. Similarly, defendant-intervenor argues that the "fact that PAE itself proposed personnel at the low range of the rate table undermines the argument that the Agency irrationally failed to assign greater technical risk to RT[]T's proposal." Def.-Int.'s CMJAR at 31. Finally, defendant argues that an agency must evaluate offerors in accordance with the RFP and not to the "undisclosed and unknowable labor rates [of] the incumbent contractor." Def. Reply at 15.

It is well settled that "contracting agencies enjoy wide latitude in conducting the cost realism analysis." *Agile Def., Inc. v. United States*, 959 F.3d 1379, 1385–86 (Fed. Cir. 2020) (internal citation omitted). To successfully challenge a cost realism analysis, a protestor must demonstrate "the absence of a rational basis for the agency's decision." *CSC Gov't Sols. LLC v. United States*, 129 Fed. Cl. 416, 429 (2016) (citing *A-T Solutions, Inc., v. United States*, 122 Fed. Cl. 170, 180 (2015)). "In a best value procurement such as this one, the contracting officer inherently exercises significant discretion." *Id*. (citing *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004)).

The Court is not convinced by plaintiff's arguments. PAE contends that the Navy should have accounted for cost risk in its cost realism evaluation by adjusting RTT's proposed direct labor rates to reflect PAE's incumbent rates. *See* Pl.'s MJAR at 28. Yet, the Solicitation specifically considered the minimum rate range used by RTT as "realistic." AR 1718–19. As noted by defendant and defendant-intervenor, the Solicitation states that the Navy's cost realism evaluation would utilize direct labor rates as follows:

> For any proposed prospective hires, Offerors shall utilize the table below that provides a rate range of direct labor rates based off of historical rates for each labor category. The only acceptable substantiation for proposing less than the Government provided labor rate range for each category is payroll verification for current employees or Letters of Intent for Contingent Hires.
>
> . . .
>
> The table below provides a rate range of direct labor rates for all of the labor categories identified under this solicitation (exclusive of Key Personnel). **The Government considers these rates realistic as they are based off of historical rate information**. This information is provided to all Offerors to ensure the realism of direct labor rates.

AR 1718–19 (emphasis added). Accordingly, RTT proposed prospective hires using direct labor rates specifically provided for in the RFP. As defendant argues, PAE even proposed the same minimum rate range as RTT did in its proposal for more than ▌% of its positions. Def.'s CMJAR at 39; *see also* AR 16424. Therefore, the Court finds that the Navy did not lack a rational basis in its cost realism evaluation of RTT's direct labor rates.

Moreover, PAE takes issue with the Navy's assessment of RTT because RTT's labor rates are lower than incumbent wage rates. However, RTT had no way of knowing direct labor rates for incumbent employees. Indeed, even if RTT had wanted to submit current wage rates for its prospective hires, this information was not publicly available. For the reasons set forth above, the Agency's cost realism evaluation was neither arbitrary nor capricious, and, thus, the Court declines to set aside those evaluations now.

### C.  Past Performance

Plaintiff alleges various arguments regarding the Navy's review of PAE's Contract Performance Assessment Reporting System ("CPARS") and its past performance rating. Pl.'s MJAR at 18–24. Specifically, PAE alleges that the Navy "cherry-picked negative comments" from its CPARs which ultimately affected its rating. Pl.'s MJAR at 20. Plaintiff contends that it received high scores, such as "Exceptional" or "Very Good" on over ▌% of its CPARs; yet, despite these high scores the "Agency arbitrarily focused on a series of negative incidents in the text of CPARs." Pl.'s MJAR at 20. As a result, plaintiff alleges that the Navy acted "irrationally and arbitrarily in violation of the RFP and case law." Pl.'s MJAR at 21.

In response, defendant argues that PAE simply took its ratings from its CPARs, tallied the number of positive comments, and then compared those to the number of negative comments it received to conclude that the ratio justified a higher past performance rating. *See* Def.'s CMJAR at 32. Defendant contends that there is nothing in the RFP "that suggests that the Navy's evaluation method was to simply calculate the arithmetic percentage of positive and negative comments in order to assess a past performance rating." Def.'s CMJAR at 32. Further, defendant disagrees that the Navy "cherry-picked negative comments" from PAE's CPARS. *See* Def.'s CMJAR at 33. Rather, defendant contends that the Navy looked at both positive and negative information from the CPARS. *See* Def.'s CMJAR at 33.

An Agency is "entitled to great deference" in bid protests challenging past performance evaluations. *Al Andalus Gen. Contracts Co. v. United States*, 86 Fed. Cl. 252, 264 (2009) (quoting *Westech Int'l, Inc. v. United States*, 79 Fed. Cl. 272, 293 (2007)). The Court's review of an Agency's past performance evaluation is limited "to ensure that it was reasonable and consistent with the stated evaluation criteria and applicable statutes and regulations, since determining the relative merits of the offerors' past performance is primarily a matter within the contracting agency's discretion." *See Glenn Def. Marine Asia v. United States*, 105 Fed. Cl. 541, 564 (2012) (internal citations omitted). Even if "the agency's interpretation of the facts giving rise to the perception of substandard prior performance is disputed by the contractor, the agency's evaluation will not be overturned as long as it is reasonable." *SDS Int'l v. United States*, 48 Fed. Cl. 742, 756 (2001) (internal citations omitted).

The Court finds plaintiff's past performance arguments unavailing. PAE contends that the Navy "cherry-picked negative comments" from its CPARs, but the Administrative Record shows that the evaluation board considered both the positive and negative aspects of PAE's proposal. *See generally* AR 19786–802. The evaluation board noted PAE and its principal entities' performance as predominantly "Very Good and Exceptional on the most recent [CPARS] and Past Performance Questionnaires (PPQs)." AR 19787. However, as defendant argues, the Navy noted its concern that "there is a theme across PAE contracts involving careless ▌▌▌▌▌▌▌▌ resulting in the ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌." *See* AR 19789.

Indeed, the Navy's assessment of PAE's positive and negative attributes were summarized in the SSA's Source Selection Decision Memorandum ("SSDM"). *See generally* AR 19912–13. Specifically, the SSA stated that "there was more positive findings and trends as opposed to adverse," but noted two significant adverse findings of ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌." AR 19912. The SSA concluded that "there is a reasonable expectation that PAE will be able to perform the effort" but "the presence of ▌▌▌▌▌▌▌▌ adverse findings leads to PAE being viewed as the least favorable offeror in terms of the Past Performance factor." AR 19913.

The Administrative Record demonstrates that the Navy meaningfully considered PAE's positive and negative past performance record before assigning it a rating of "Satisfactory," the second-highest rating for Past Performance. *See generally* AR 1738. As such, where, as here, the Agency gives meaningful consideration to past performance, and its evaluation thereof is reasonable, the Court will not infringe upon the Agency's decision-making. *See Glenn Def. Marine*, 105 Fed. Cl. at 564. Accordingly, the Court finds that the Navy appropriately evaluated and rated PAE's past performance.

        **D.**    **Prejudice and Injunctive Relief**

Plaintiff alleges that it was "prejudiced by the Navy's arbitrary and capricious evaluation of its key personnel because, had the Navy not assigned the deficiency, PAE's proposal would have been acceptable and earned a rating of 'Good' (at least), putting PAE on par with RT[]T and providing it a substantial chance at award." Compl. at 15–16; *see also* Pl.'s MJAR at 3–4. In response, defendant argues that the "fatal problem with all of PAE's arguments regarding prejudice . . . is that it is ineligible for contract award, due to its failure regarding the key personnel issue." Def.'s CMJAR at 47.

This Court "will not disturb a best-value award so long as the agency 'documents its final award decision and includes the rationale for any business judgments and tradeoffs made.'" *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 360 (2009) (quoting *Blackwater Lodge & Training Ctr. v. United States*, 86 Fed. Cl. 488, 514 (2009)) (citation omitted). So long as there exists a "rational connection between the facts found and the choice made," the Court will not set a procurement decision aside. *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 390 (2003) (quoting *Motor Vehicle Mfrs. Ass'n v. State farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The Court is inclined to agree with defendant for all of the reasons articulated above. Additionally, the Navy documented that even if PAE had resolved its deficiency

regarding key personnel, "it still would not be among the most highly evaluated offerors." AR 19944. Accordingly, the Court finds that plaintiff suffered no prejudice.

Finally, plaintiff alleges that it is entitled to permanent injunctive relief. When analyzing whether a permanent injunction is proper, a court must analyze "whether, as it must, the plaintiff has succeeded on the merits of the case." *PGBA, LLC v. United States*, 389 F.3d 1219, 1229 (Fed. Cir. 2004). As the plaintiff did not succeed on the merits of its case, the Court need not analyze whether it is entitled to permanent injunction.

### IV. Conclusion

For the reasons set forth above, plaintiff's MOTION for Judgment on the Administrative Record is hereby **DENIED**. Defendant and defendant-intervenor's CROSS-MOTIONS for Judgment on the Administrative Record are hereby **GRANTED**. Accordingly, defendant-intervenor's Motion to Dismiss is hereby **DENIED AS MOOT**. The Clerk is directed to enter judgment in favor of defendant and defendant-intervenor, consistent with this opinion.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith
Senior Judge